

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **MOORE OIL COMPANY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case Number:** |
| **v.** | ) | **2:07-cv-01475-JEO** |
| | ) | |
| **D&D OIL COMPANY, INC.,** a | ) | |
| foreign corporation, **SUPERIOR** | ) | |
| **TRANSPORT, INC**., a foreign | ) | |
| corporation, **THE PANTRY, INC**., | ) | |
| a foreign corporation, and **LARRY** | ) | |
| **MARTIN**, an individual | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

The court, sitting pursuant to its diversity jurisdiction under 28 U.S.C. § 1332(a), has

before it the motion of the defendants, D&D Oil Company, Inc., Superior Transport, Inc., The

Pantry, Inc., and Larry Martin (hereinafter referred to collectively as "Defendants"), for summary

judgment on the claims of the plaintiff, Moore Oil Company, Inc. (hereinafter "Plaintiff"), filed

pursuant to FED. R. CIV. P. 56(c) on April 10, 2009.  (Doc. 45).[1]  The motion has been fully

briefed and is now subject to the court's review.  Upon consideration, the motion is due to be

granted.

## I.    FACTUAL HISTORY

Plaintiff is a family-owned wholesale distributor of petroleum products in Jefferson

County, Alabama.  (Restated and Amended Complaint (doc. 2) ¶ 1; Moore 2006 Dep. 15-16;

---

[1] References to "Doc(s).___" are to the documents as numbered by the clerk of court in the court's record of the case.

Moore 2008 Dep. 11).[2]  It currently carries, or has carried, petroleum products branded by Chevron, Citgo, Exxon, Amoco and Shell for distribution through eleven counties in Alabama. (Moore 2006 Dep. 15-17; Moore 2008 Dep. 11, 38).  It supplies petroleum products to approximately 100 third-party-owned gasoline service stations, and owns approximately 50 service stations to which it supplies said products.  (Moore 2006 Dep. 21-22; Moore 2008 Dep. 38-39, 201).  Its president is Ronald J. Moore, Sr. (hereinafter "Moore" or "Moore, Sr."). (Moore Aff., doc. 45, ex. 3 at 1).[3]

In the mid-1990's, Plaintiff entered a contract whereby it supplied petroleum products to William P. Pilato (hereinafter "Pilato") at Pilato's gasoline service station on Finley Avenue in Birmingham.  (Moore 2006 Dep. 25-27; Moore 2008 Dep. 41).  Under the terms of that agreement, Pilato was to pay Plaintiff for its gasoline deliveries within ten days of receiving each load.  (Moore 2008 Dep. 42).  However, Pilato soon became delinquent in his account by failing to pay for Plaintiff's deliveries.  (Moore 2006 Dep. 27-33).  It is not clear by what amount Pilato fell behind on the account, but the delinquency was apparently not cured until he sold the station to a third party.  (*Id*. at 27, Moore 2008 Dep. 189-190).

After selling the Finley Avenue station, Pilato acquired two other gasoline service stations, a Chevron station on U.S. Highway 280 in Homewood, Alabama, and a Citgo station on Greensprings Avenue also in Homewood.  (Moore 2006 Dep. 27, 43-44).  On dates unspecified in the record, Plaintiff entered into exclusive supply contracts with Pilato at both stations.  (*Id*. at 28-29).

---

[2]References to exhibits are to document 45 in the court's electronic record.

[3]Moore's affidavit in the bankruptcy proceeding is located at document 45-1 in the electronic record.

Pilato soon fell behind on both accounts.[4]  (*Id*.)  Moore testified that Pilato

> became delinquent and what we refer to [as] "out of terms [with our contracts]...."
> [W]e would have to put his credit on hold from time to time.  This is the standard
> method of getting your money as it's due when it's not in terms and when it's not by
> agreement, to put the credit on hold.  That's the only way you can control this,
> because [gasoline is] a commodity that vaporizes.  It's gone, and ... there's no
> recourse on gasoline that has been sold....  [C]redit may be on hold for two hours or
> a day ... and it was not peculiar just to Pilato.  This is the way the industry does
> business....  [I]f you do not pay your bill and your invoices as they come in, [the
> gasoline supplier] simply put[s] your credit on hold....

(Moore 2006 Dep. 29-31).  When it placed his credit on hold, Plaintiff stopped supplying Pilato's

stations with gasoline.  (*Id*. at 53-54).  Although this occurred more than ten times, according to

Moore, Pilato was never without a supply because "we did our best to keep gasoline to him even

though we knew this thing was – that it had to be managed carefully."  (*Id*. at 54).  To have his

credit released, Pilato did not need to become current on his account with Plaintiff.  (*Id*.)

Instead, he paid cash on delivery for new loads, or got "caught up [on] some of the past due" on

his account.  (*Id*.)

Plaintiff eventually, on a date unspecified in the record, purchased the Chevron station

from Pilato to settle his debt for that station.  (*Id*. at 37).  Pilato's debt to Plaintiff on the Citgo

station was satisfied when he sold it to an unknown third party on a date also unspecified in the

record.  (*Id*. at 44).

Although Moore testified that "we always got our money out of [Pilato]" by purchasing

his service stations from him, the record is inconsistent on this point.  (Moore 2008 Dep. 192).

Moore explained that Pilato "got his account paid [when Plaintiff bought a station from Pilato],

---

[4]When asked in deposition whether he could recall the specific amounts Pilato owed Plaintiff at these stations, Moore stated he could not, due to the change in gasoline prices from the mid-1990's to the present.  He explained that "[a] load of gasoline back then maybe was ... $2,000 or something for a load.  Today it's $25,000 for a load of gasoline...."  (Moore 2006 Dep. 29-30).

but I wound up having to buy in some cases and pay more than the property was worth to get it cleaned up." (Moore 2006 Dep. 45). Moore testified further that Plaintiff "took a loss" at each of the stations it purchased from Pilato. (*Id*. at 46).

According to Moore, working with Pilato also cost Plaintiff a great deal of time and effort in managing Pilato's delinquent accounts. Moore testified that

> to do business with Mr. Pilato, it required a high percent of my whole operation's time, even myself. We were doing everything we knew to do to try to help this man survive. [H]e would visit with us, and we would talk to him and try to work things out, and he would maybe go make a loan or something. We don't know where he would come up with a little bit of money to get his account back open. But the dispatcher [who] dispatched his gasoline ... spent a large percent of his time just trying to manage around getting gasoline to the Galleria Chevron. My [ ] accounts receivable manager spent a third of her time trying to manage these credit cards and trying to get money in to release another load [of gasoline to Pilato despite his mounting debt to Plaintiff]. It was a constant battle on and on and on, and it still grew. Mr. Pilato, he's a very convincing person to talk to [ ], and he would come out and talk to us and get his account opened even though it would not be paid and get more loads [of gasoline for his stations]. And finally he brought some – I can't recall if it was a CPA or a lawyer, but they worked out a deal with us whereby they would give us a security interest in the property even though it was a third position secured interest. We took the third mortgage on his property, which opened the gate again for some additional product. And of course, that failed to be successful. We were not successful in rehabilitating him even with that.

(Moore 2006 Dep. 41-42). Moore later explained that this third mortgage on the Galleria Chevron served as an open line of credit to Pilato, the value of which "would vary for whatever [Pilato] would owe on his account" to Plaintiff. (*Id*. at 48-51). Regardless of the amount, however, Pilato never "improved his position" or became more current in his payments to Plaintiff. (*Id*.) Ultimately, however, Moore explained that Plaintiff continued working with Pilato because he was

> a very persuasive person to do business with.... He's a likeable person. Even with

4

him delinquent or out of terms with us, he still was likeable.... [Even now], there's no animosity [between us].  He's a person that you kind of want to help.  I can't explain that....  We never intended to terminate doing business with [Pilato] at all, but we were determined to try to collect our money.

(*Id*. at 46, 50).

Moore was the only person at Moore Oil Company who could decide to stop doing business with Pilato, but he never exercised that authority or even discussed the possibility of termination with Pilato.  (*Id*. at 55-56).  To the contrary, Plaintiff extended Pilato a personal loan on at least one occasion:

> I know that we did everything that could be done to try to rehabilitate him, his business, and try to help him.  He needed it – I recall one instance [where] he needed some money real bad, and I – rather than me put more money in – you know, just an outright loan or give him money, I underwrote a bank note that he went to a bank and I signed it.  Well, I had to pay it 100 percent.  [ ] That incident, it was like $25,000.  He needed the money to make some kind of peace at home.  I don't know.  [H]e's supposed to have paid [it] back – paid that off or paid it back on a gallonage-type surcharge deal.  I never got any of the recovery of it.  He never paid any of it. [ ] This was not unusual for him as he would have financial problems on an ongoing basis.  You know, to come to me for help on it.  I put a lot of time – he's a very persuasive person.  Very persuasive.

(Moore 2008 Dep. 184-86).

After he sold his Homewood stations, Pilato acquired a fourth service station, located on State Highway 150 in Hoover, Alabama (hereinafter "the Galleria Chevron" or "the station").  (*Id*.)  In December 1997, Plaintiff and Pilato entered a contract whereby Plaintiff became the exclusive motor fuel supplier at the Galleria Chevron, and owner of a third mortgage and security interest in that property.  (Restated and Amended Complaint (doc. 2 ¶ 1); Motor Fuel Supply Contract (doc. 45) ex. 1 at 4, ¶ C ("Buyer shall only sell petroleum products ... from the Premises, which Buyer has purchased from Seller"); Moore 2006 Dep. 27; Moore Aff. (doc. 45,

ex. 3 at 1-2).  Moore testified that this account

> was almost immediately a problem account.  The credit was placed on hold
> numerous times throughout the life of our dealings with Mr. Pilato.  We advanced
> the money, took ... the supply contract and relied on that.  We forewent [other
> contract opportunities] in that area, because once you brand [one station in an
> area], you don't want to put competition in on them.

(Moore 2006 Dep. 38-39).

Pilato's debt to Plaintiff apparently fluctuated throughout the period relevant to this

action.  In May 2002, Pilato and Plaintiff signed a Renewal Promissory Note that explained

> This Promissory Note evidences the renewal and refinancing of Borrower's
> obligations to Lender originally evidence by that certain $62,337.52 Promissory
> Note dated February 26, 2002, which was a renewal and refinancing of a $137,500
> Promissory Note dated December 15, 1997, that certain $92,658.12 Promissory
> Note dated April 10, 2001 and that certain $60,376.53 Promissory Note dated
> December 31, 2001.

(Moore Aff., Ex. E (Renewal Promissory Note), at 1)).  By November 2003, Pilato owed Plaintiff

approximately $41,000, but by November 2004 that amount had increased to approximately

$226,000 by November 2004. (Moore Aff. dated November 17, 2004 (doc. 45, ex. 14)).  Plaintiff

attempted to rehabilitate its relationship with Pilato by renegotiating the terms of the contract to

"some terms that [Pilato] could live with," and that same year, those terms were extended to June

1, 2012.  (*Id.*; Moore Aff., Ex. F (Second Amended to Motor Fuel Supply Contract); Moore 2006

Dep. 74, 97)).  Meanwhile, Pilato's credit was repeatedly placed on hold and then released, while

his debt to Plaintiff continued to increase.  (Moore 2006 Dep. 40-41).

Despite Plaintiff's efforts to continue working with Pilato, the record indicates that, by

2004, Pilato had determined to stop working with Plaintiff and to pay off his debt to Moore Oil

by selling the Galleria Chevron.  (Pilato Dep. 36-40).  He first contacted D&D Oil Company

(hereinafter "D&D"), a supplier of unbranded petroleum products and a competitor of Plaintiff, through its real estate agent during the summer of 2004. (*Id*. 36-37). After various attempts to negotiate a sale, Pilato rejected D&D's offer to buy the station for $1.7 million because the price would not cover his entire debt to Plaintiff. (Pilato Dep. 39-41).

By the fall 2004, as it became apparent that D&D would not purchase the Galleria Chevron, Pilato and D&D began to discuss re-branding the station into a "Cowboys" station that sold unbranded gasoline supplied by D&D. (*Id*. at 43, 45). Meanwhile, Pilato contacted other suppliers, while continuing to receive gasoline deliveries from Plaintiff, until October 9, 2004, when Plaintiff notified Pilato that it was again placing his credit on hold due to the increasing delinquency on his account. (*Id*. at 20, 53-57). At some point during the month of October, Pilato, apparently for the first time since he began working with Plaintiff, stopped making payments to Plaintiff altogether. (*See* Moore 2008 Dep. 49("When [Pilato's] debt skyrocketed is when he got someone else to sell him gasoline. He just quit paying me entirely.")).[5]

Meanwhile, by November 9, 2004, Plaintiff had purchased the two senior security interests in the Galleria Chevron, so that it now was the owner of the primary security interest in that property. (Moore 2006 Dep. 59; Moore Aff. (doc. 45, ex. 3) 1-2). On October 14, 2004, Plaintiff's attorney informed Pilato that Plaintiff was accelerating $477,323.36 of his debt on the Galleria Chevron account. (Moore 2006 Dep. 71, 105; Moore Aff., Ex. C (Notification of Disposition of Collateral and Letter to Pilato and Hollywood Convenience Store, Inc. dated

---

[5]Moore also testified that, aside from the amounts Pilato had paid to Plaintiff on the Galleria Chevron account, Plaintiff also received a large portion of revenue through that station's credit card system, because that particular station drew much of its sales through credit card transactions. (Moore 2008 Dep. 50-51). According to Plaintiff, when D&D began supplying unbranded gasoline to the Galleria Chevron, D&D "stopped [Plaintiff's] credit card program. They put another credit card system in whereby they would get the credit card money rather than it go through the normal channel.... Our money stopped [coming in through the credit card system] when [D&D] stopped our pay-at-the-pump process system whereby they could get all the credit card money and it stopped coming to us. And, therefore ... our accounts receivable skyrocketed." (*Id*. at 51).

October 14, 2004)).  This amount represented only the gasoline loads and incentives that had

previously been forwarded to Pilato and remained unpaid on Pilato's account.  (Moore 2006 Dep.

105).  It did not include the debts incurred by Plaintiff in purchasing the two senior security

interests on the Galleria Chevron property, which totaled approximately $700,000 and $550,000,

respectively.  (*Id*. at 108).  Also on October 14, Pilato's attorney placed an advertisement with

the Alabama Messenger for the foreclosure of the Galleria Chevron.  (Moore 2006 Dep. 71, 105).

On October 21, 2004, Plaintiff made its last delivery of gasoline to the Galleria Chevron under its

contract with Pilato.  (Moore 2008 Dep. 118, 166, 172).  The following day, Pilato bought two

loads of gasoline from Veteran's Oil Company, for which he paid cash-on-delivery.  (Doc. 45,

Ex. 7 (Veteran's Oil Accounts Receivable Report, October 22-25, 2004)).  On October 26, he

received his first delivery of gasoline from D&D.  (Doc. 45, Ex. 10 (Accounts Receivable

Statement for William Pilato Account #1061); Moore 2008 Dep. 125-26).

On November 8, 2004, the day before Plaintiff was to purchase the Galleria Chevron via

foreclosure sale, Pilato filed for Chapter 11 bankruptcy protection.  (Doc. 45, Ex. 1) Moore Aff.

dated November 11, 2004)); (Doc. 45, Ex. 11 (Voluntary Petition for Bankruptcy dated

November 8, 2004)).  On December 3, 2004, the bankruptcy court granted Plaintiff's Motion to

Dismiss the petition.  (Doc. 45, Ex. 12 (Order of Dismissal)).

On December 13, 2004, Plaintiff sent a letter to D&D, McCullough Oil Company,

McPherson Oil Company, Veteran's Oil Company, and Williams Oil Company, informing each

company that Pilato was contractually bound to Moore Oil Company as his exclusive gasoline

supplier, and asking each company to stop supplying gasoline to Pilato at the Galleria Chevron.

(December 13, 2004 Letter from Ronald Moore, Sr., to McCullough Oil Company, Inc.,

8

McPherson Oil Company, Veteran's Oil Company, Higginbotham Oil Company, and D&D Oil

Company (Doc. 45, Ex. 15); Moore 2006 Dep. 109; Moore 2008 Dep. 70, 128).

D&D stopped supplying gasoline to Pilato in December 2004.  (Shadday Dep. (Doc. 45,

Ex. 16) 118-119).  The record does not indicate whether this was due to the letter itself or to the

fact that Pilato had fallen behind on his payments to D&D.  (*Id*.)  D&D's last delivery to Pilato

occurred on January 1, 2005, for a total of 259,170 gallons delivered since October 26, 2004.

(*Id*. at 119; Michael E. Mason Expert Report on Damages dated January 26, 2009 (Doc. 45, Ex.

17)).  As of the time of this action, Pilato still owed D&D approximately $81,000 for past-due

gasoline deliveries.  (David Shiflett Dep. (Doc. 45, Ex. 9) 92).

In January 2005, Plaintiff took possession of the Galleria Chevron and, at the time of this

action, continued to own and operate it through a commission marketing agreement with a third

party operator.  (Moore 2008 Dep. 193).  On February 25, 2005, D&D sold its assets to The

Pantry, Inc., and D&D Oil Company was dissolved.[6]  (Doc. 25 (Amended Complaint) at ¶¶ 9,

10).

## II.     PROCEDURAL HISTORY

Plaintiff filed its Complaint in the Jefferson Country Circuit Court on November 23,

2005.  In it, Plaintiff alleged that D&D intentionally interfered with Plaintiff's exclusive supply

contract with Pilato.[7]  (Doc. 1, Notice of Removal, ¶ 1; Doc. 1, Ex. A at 96).  On July 18, 2007,

Plaintiff filed an Amended Complaint, adding as additional defendants Superior Transport, Inc.,

---

[6]Despite reviewing the record in its entirety, it is not clear therein what type of business The Pantry, Inc., purports to be.  The court can ascertain therefrom only that it is a publicly-held corporation organized under the laws of Delaware, and it does not have a parent corporation.  (Doc. 6, "Rule 7.1 Corporate Disclosure Statement").

[7]The original state court action is styled *Moore Oil Company, Inc., v. D&D Oil Company, Inc., et al*, in the Circuit Court of Jefferson County, Alabama, CV-05-7001.  (Doc. 1, Ex. A at 96).

The Pantry, Inc., Jarrett Shadday, and Larry Martin.  (Doc. 1, Ex. A2, 54-62, ¶¶ 3-9).  Superior

Transport, Inc., was also engaged in the sale and delivery of petroleum products and appears to

have been partnered with D&D in some fashion as a supplier and operator of gasoline service

stations.  (Second Amended Complaint (Doc. 25) at ¶ 3).  Jarrett Shadday and Larry Martin were

shareholders and directors of D&D Oil Company during its operation and, at the time of this

action, Shadday was a shareholder of Superior Transport, Inc.  (*Id.* ¶ 9).  Plaintiff alleges that

both individuals participated in the transfer, "or artifice structured as a sale," of the capital stock

of D&D Oil Company to The Pantry, Inc. in early 2005, referenced *supra*.  (*Id.*)

     Premised on the court's diversity jurisdiction, Defendants removed the action to this court

on August 13, 2007.  (Doc. 1).  The same day, Plaintiff filed its "Restated and Amended

Complaint," asserting the following claims against Defendants:  (1) intentional interference with

a contract; (2) intentional interference with a business relationship; (3) improper notice of the

dissolution of D&D Oil Company and its transfer of assets to The Pantry, Inc., Jarrett Shadday

and Larry Martin; (4) suppression of material facts relating to the dissolution of D&D and its

transfer of assets; and (5) fraudulent transfer of assets.  (Doc. 2).  Also on August 13, 2007,

Defendants filed their Answer to Plaintiff's Restated and Amended Complaint.[8]  (Doc. 4).

     On August 14, 2007, Jarrett Shadday filed a Motion to Dismiss Plaintiff's claims as to

him for lack of personal jurisdiction pursuant to FED. R. CIV. P. 12(b)(2), which the court granted

on February 22, 2008.[9]  (Docs. 8, 23, respectively).  After the close of discovery on March 20,

---

[8]Defendants also asserted a counterclaim against Plaintiff, in which they charged that Plaintiff's claims against them were "a malicious and wrongful use of a regular valid process to accomplish an illegal and improper purpose."  (Doc. 3).

[9]On March 19, 2008, Plaintiff filed a Second Amended Complaint, alleging that D&D, Superior Transport, Inc., and The Pantry, Inc., violated certain sections of the Georgia Code, including §§ 18-2-71, 14-2-1401, *et seq.*, and reasserting its claims against Jarrett Shadday.  (Doc. 25).  Shadday's renewed Motion to Dismiss for lack of personal jurisdiction as to him was

2009, Defendants filed the pending Motion for Summary Judgment on April 16, 2009. (Doc. 45). Plaintiff responded in opposition to the motion on May 18, 2009, to which Defendants replied on May 29, 2009. (Doc. 48, 50, respectively). As stated *supra*, the motion is now subject to the court's review.

### III.   STANDARD OF REVIEW

Under FED. R. CIV. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553. Once the moving party has met its burden, Rule 56(c) requires the nonmoving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

The substantive law will identify which facts are material and which are irrelevant. *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *Chapman*, 229 F.3d at 1023; *Fitzpatrick v.*

---

granted on July 21, 2008. (Doc. 31).

*City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *Chapman*, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *Anderson*, 477 U.S. at 249; 106 S. Ct. at 2511.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17, citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (*en banc*).  If the moving party bears the burden of proof at trial, then it can meet its burden on summary judgment only by presenting positive evidence that demonstrates the absence of a genuine issue of material fact; i.e., facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for a directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of

12

any evidence in the record in support of a judgment for the nonmoving party on the issue in question. This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial but does not require evidence negating the nonmovant's claim; it simply requires the movant to point out to the court that there is an absence of evidence to support the nonmoving party's case. *Fitzpatrick*, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the nonmoving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the nonmoving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 116 S.Ct. 2174, 135 L. Ed.2d 606 (1996), *citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 2137, 119 L. Ed. 2d 351 (1992).

## IV.    ANALYSIS

In its Second Amended Complaint, Plaintiff asserts six counts against Defendants: intentional interference with a contract (Count I), intentional interference with a business relationship (Count II), improper notice (Count III), suppression of material facts (Count IV), fraudulent transfer by Larry Martin and Jarrett Shadday (Count V), and fraudulent transfer by The Pantry, Inc. (Count VI). (Doc. 25). Because Counts I and II are the primary bases for this action, upon which Counts III through VI assert derivative claims thereof, the court will address those counts first.[10]

---

[10]In *Gross v. Lowder Realty Better Homes and Gardens*, 494 So. 2d 590, 597 (Ala. 1986) (*overruled on other grounds*, *White Sands Group, L.L.C. v. PRS II, LLC*, 2009 WL 2841114 (Ala. Sep 04, 2009)), the Alabama Supreme Court merged claims for intentional interference with a contract and intentional interference with a business relationship into one cause of action ("We see no reason to continue the distinction between the two causes of action and are of the opinion that a single set

To establish a *prima facie* case of intentional interference with a contract, Plaintiff must demonstrate the following:  (1) a protectable business relationship or contract; (2) of which the defendant knew; (3) to which the defendant was a "stranger," *i.e.*, a third-party; (4) the defendant's intentional interference with the contract or business relationship; and (5) resulting damage to the plaintiff.  *White Sands*, 2009 WL 2841114 at * 5, 7.[11]

The parties do not dispute that the first and third elements are satisfied.  Defendants, however, argue that the claim fails because Plaintiff cannot demonstrate that D&D knew Plaintiff was under contract with Pilato to supply the Galleria Chevron.[12]

Here, the court finds sufficient evidence that D&D had actual knowledge of the contract.  Pilato testified that he told D&D's real estate agent he was still under contract with Plaintiff

---

of elements, broadly defined, so as to include both causes of action, would simplify and clarify the law in this area").  Accordingly, the court addresses both claims as one with a single set of elements set forth *infra*.  Additionally, for the sake of brevity, the court hereinafter refers to Plaintiff's and Pilato's contract and business relationship collectively as "the contract."

[11]At the time of this action, Alabama courts required evidence of an additional element, "absence of justification" for the interference, to support a *prima facie* case of intentional interference.  *See Gross*, 494 So. 2d at 594.  After Defendants' motion came under submission, the Alabama Supreme Court decided *White Sands*, in which the court disposed of "absence of justification" as a sixth element of a plaintiff's *prima facie* case.  2009 WL 2841114 at * 5.  "Justification" is now an affirmative defense to be pleaded and proved by the defendant.  *Id.*  To the extent they required this element as part of a plaintiff's *prima facie* case, *Gross* and its progeny were overruled.  *Id.* at *7.

[12]As a preliminary matter, the parties disagree whether Plaintiff must show that D&D had actual or constructive knowledge of the contract.  Defendants argue that Plaintiff must demonstrate actual knowledge for its claim to survive summary judgment.  Plaintiff responds that Alabama law is ambiguous on the subject, and therefore implies that constructive knowledge will suffice.

Defendants cite to three cases for their argument that Plaintiff must show actual knowledge by D&D.  A close reading of these cases, however, reveals that none of them expressly requires actual knowledge to avoid summary judgment.  In *Ex parte Awtrey Realty Co.*, 527 So. 2d 104, 108-09 (Ala. 2001), the court lists the elements of an intentional interference claim, without clearly stating whether the defendant's "knowledge" of the contract was – or must be – actual or constructive.  Similarly, in *Gilbert v. Congress Life Ins. Co.*, 646 So. 2d 592, 594 (Ala. 1994), and *Starr v. Wilson*, 11 So. 3d 846, 856 (Ala.Civ.App. 2008), the courts fail to clearly address whether a plaintiff must show actual or constructive knowledge to support an intentional interference claim.

Although these cases, on their faces, do not specify whether actual or constructive knowledge satisfies this element of the claim, the court concludes that a defendant must have actual knowledge of a contract before a plaintiff can demonstrate *intentional* interference therewith.  *Cf. Awtrey*, 827 So. 2d at 108-09 (affirming summary judgment for the defendant because "no evidence [was] adduced indicating that [the defendant] had any knowledge of [the plaintiff's] right of first refusal"); *Gilbert*, 646 So. 2d at 594 (affirming summary judgment for the defendant because the plaintiff "produced no evidence that [the defendant] ever knew of any alleged contractual relationship").

14

when he contacted him about selling the Galleria Chevron.  (Pilato Dep. 39).  Pilato also

informed David Shiflett[13] of the contract, and asked Shiflett if D&D would supply his station "if

... [his] arrangement with [Plaintiff] fell through."  (*Id*. at 48).  Pilato also asked Shiflett if D&D

would rebrand the Galleria Chevron "so [he] could pay [Plaintiff] off."  (*Id*. at 45-46).

Additionally, Shiflett planned to arrange for "the striping, and the re-imaging of the canopy, the

re-imaging of the pumps, [and] painting" of the station, but stipulated that none of this would

occur until Pilato's contract with Plaintiff was "handled":

> Q:      So the striping, painting and that kind of stuff that D&D was going to do was all
>         on hold pending you getting everything straightened out with Mr. Moore?
>
> A:      Yes.

(*Id*. at 64).  Pilato also testified that, "[a] guy came out to look at my building to see how much

striping was going to be. [ ]  So they were doing some stuff to the pumps to image them."  (*Id*. at

50).  While the record does not indicate whether this "guy" was sent by D&D or hired by Pilato,

Pilato's testimony creates at least a question of fact whether D&D was behind these efforts to

change the Galleria Chevron into a "Cowboy's" station.

       To counter this evidence, Defendants offer several points that, according to them,

demonstrate that D&D did not know there was a valid contract between Pilato and Plaintiff,

including:

> (1)     During their earliest discussions, Pilato told Shiflett that his
>         contract with Plaintiff was "null and void" (Shiflett Dep. 31, 36;
>         Pilato Dep. 77);
>
> (2)     Pilato's attorney confirmed to Shiflett that the contract was "null
>         and void" (*Id*. 41-42);

---

[13]Shiflett formerly worked with D&D and Superior Transport.   (Shiflett Dep. (Doc. 45, Ex. 9) 10-11).

(3)     Shiflett observed that the Chevron signs and insignia at the Galleria Chevron had been covered with black plastic to indicate that it was an unbranded station (*Id*. 31);

(4)     Pilato was purchasing fuel from "other suppliers" at the time of D&D's initial dealings with Pilato (*Id*. 64-65);

(5)     In his bankruptcy filings in November 2004, Pilato expressed that he was operating the Galleria Chevron as an unbranded station (Ex. 13 ¶ 12); and,

(6)     Ronald Moore, Sr., testified that he had no evidence that D&D knew Pilato was under contract with Plaintiff (Moore 2006 Dep. 127-28).

(Doc. 45 at 11-13).  These points are supported by the record, and are not disputed by Plaintiff.

(Doc. 48 at 5-11).  Nevertheless, in light of the evidence addressed *supra* that suggests D&D did know there was a contract between Pilato and Plaintiff, the court is satisfied that Plaintiff has carried its burden as to this element.

However, assuming that D&D knew about the contract, the court addresses Defendants' next argument that Plaintiff's claim fails because it has not demonstrated that D&D *intentionally* interfered with the contract.  Alabama courts have routinely relied on the Restatement (Second) of Torts as authority for analyzing intentional interference claims.  *See, e.g., KW Plastics v. U.S. Can Co.*, 131 F. Supp. 2d 1265, 1268 (M.D. Ala. 2001) ("In defining the scope of this cause of action, Alabama courts have relied on the Restatement (Second) of Torts"), citing *Ex parte ALDOT*, 764 So. 2d at 1270; *Barber v. Business Prods. Center, Inc.*, 677 So. 2d 223, 228 (1996); *Gross*, 494 So. 2d at 598 (Torbert, J., concurring and dissenting in part) (discussing the Restatement at length, and explaining generally that "[t]he expansive new tort [combining intentional interference with contractual relations and intentional interference with business

16

relations into a single cause of action] adopted by the majority reflects the view advanced in the Restatement (Second) of Torts § 766-§ 774A (1979)"); *White Sands*, 2009 WL 2841114 at * 5-6 (discussing justification as defined by § 767 of the Restatement); *JJ's Heating & Air Conditioning, Inc. v. Gobble-Fite Lumber Co.*, 572 So. 2d 1243, 1245 (Ala. 1990) (same); *Creel v. Davis*, 544 So. 2d 145, 149 (Ala. 1989); *Tom's Foods, Inc. v. Carn*, 896 So. 2d 443, 457-458 (Ala. 2004) (applying doctrine of competitor's privilege as defined by § 768 of the Restatement to intentional interference claim).

Section 767, comment d, of the Restatement offers the following insight on the element of "intent":

> Since interference with contractual relations is an intentional tort, it is required that in any action [for intentional interference with a contract] the injured party must show that the interference with his contractual relations was either desired by the actor or known by him to be a substantially certain result of his conduct. (See § 8A). Intent alone, however, may not be sufficient to make the interference improper, especially when it is supplied by the actor's knowledge that the interference was a necessary consequence of his conduct rather than by his desire to bring it about. In determining whether the interference is improper, it may become very important to ascertain whether the actor was motivated, in whole or in part, by a desire to interfere with the other's contractual relations. If [a desire to interfere] was the sole motive the interference is almost certain to be held improper. A motive to injure another or to vent one's ill will on him serves no socially useful purpose.
>
> The desire to interfere with the other's contractual relations need not, however, be the sole motive. If it is the primary motive it may carry substantial weight in the balancing process and even if it is only a casual motive it may still be significant in some circumstances. On the other hand, if there is no desire at all to accomplish the interference and it is brought about only as a necessary consequence of the conduct of the actor engaged in for an entirely different purpose, his knowledge of this makes the interference intentional, but the factor of motive carries little weight toward producing a determination that the interference was improper.

§ 8(A) of the Restatement addresses "intent" in relevant part:

17

> Intent is not ... limited to consequences which are desired.  If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.  As the probability that the consequences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses the character of intent....

As stated, the Restatement characterizes a court's consideration of "intent" as a "balancing process," in which the defendant's desire to interfere may, by itself, satisfy this element of an intentional interference claim.  By contrast, where the defendant interferes without specifically desiring that result, it is less certain – but still possible – to satisfy this element of the claim.

After parsing through the record in detail, the court finds no evidence that D&D desired, either primarily or casually, to interfere with the contract between Plaintiff and Pilato.  Hence, Plaintiff must demonstrate that D&D either knew its conduct was substantially certain to interfere with the contract or that such interference was a necessary consequence of its conduct.

Plaintiff attempts to carry this burden by arguing – without any citations to the record – that D&D "intended to sell gasoline products to the Galleria Chevron.  [Its] clear desire was to be the supplier of the large volume being dispensed from the Station."  (Pl's Response (Doc. 48) 18).  If this were true, however, Plaintiff does not explain why the record consistently points to Pilato, not D&D, as the initiator of contact between the two parties, as Pilato testified:

> Q:     What was it that caused you to call Cowboys?
>
> A:     When I saw that I was going to be without a supplier, I began checking around to see who I could purchase gasoline from should Moore Oil cut me off.
>
> ******
>
> A:     [ ]  Initially, I thought ... the way out was to possibly sell my station.  So I got the name of [D&D's] real estate man[.]

18

******

Q:      Okay.  How did you get referred to him?

A:      I call[ed] D&D and asked them who buys land or who buys stations [for D&D]. . .

******

Q:      And what did they tell you?

A:      They gave me a man's name, and I called him.

Q:      And who was that?

A:      I can't recall his name.

Q:      Okay.  Was he located here in Birmingham?

A:      No.  He was in the same town as their home office.  I believe it's Macon, Georgia.  [ ]  He ... said there was a possibility they may be interested in buying my location.

Q:      And when you say "they," who was he talking about?

A:      D&D.

Q:      [ ] What else did he say?

A:      He said he would see if there was any interest and get back to me.

Q:      And did he get back to you?

A:      Yes.

Q:      When did he get back to you?

A:      It was two or three weeks.

Q:      And he called you?

A:      Yes, he called me back.

Q:     All right.  And what happened in that conversation?

A:     He said I had a good location.  The lot wasn't quite big enough for what
       they do....  But they would still be interested because it's such a good piece
       of property and had the potential to do more.

Q:     Okay.

A:     [H]e asked me ... [whether] I was under contract now for gasoline and I
       said, "Yes."  And he said, "Well, in order for us to be a prospect for your
       station, you would have to pay off the remaining term of your gasoline
       contract in order to make a sell [sic]."

                                    ******

A:     We spoke back and forth several times, negotiated.  [ ]  Cowboys made an
       offer on my station.  And I had anticipated to sell it.  I had a deal on the
       table of an amount which was not necessarily an attractive offer to me
       because of the amount involved that would be needed to pay Moore Oil off
       the remaining amount of my contract.

Q:     How much did they offer?

A:     I believe it was 1.7 million.

                                    ******

Q:     So what happened about the million seven offer, did you reject it?

A:     Yes.  It wasn't enough money to cover what I was going to have to pay off,
       the life of my gas contract.

                                    ******

Q:     Were you trying to market [the station] to anybody ... other than D&D...

A:     Yes.

Q:     Who were you trying to market it to?

A:     I had several inquiries from some people....  [T]hey were from out of the
       country.

                                    ******

20

Q:    Did you continue in any further negotiations with D&D after you rejected the million seven offer?

A:    Yes.  The real estate man asked me what I was going to do.  And we continued to talk.  But no other offers were forthcoming because I believe we had reached the ceiling on what they wanted to pay or that's what they were able to pay at the 1.7 million.

                           ******

Q:    You first thought you could sell the station.  And apparently at some point you decided you couldn't sell the station; is that right?

A:    Yes.

Q:    Because D&D seemed to be the best deal that you had going?

A:    Yes.

Q:    And when you rejected that, you weren't able to sell the station unless one of these out of the country people would buy it?

A:    Yes.

Q:    Did you then try to make arrangements to replace Moore as a supplier?

A:    Yes.

Q:    What arrangement did you try to make and who did you talk to about that?
A:    I asked D&D, David Shiflett if they would sell me gasoline.

                           ******

A:    I called David Shiflett and asked him about the possibility of branding my store Cowboys, you know, and would there be any rebates involved so I could pay Moore off should I be re-branded Cowboys, how that would work.

                           ******

Q:    And what was his response to that?

A:    There were no rebates available due to the non-branded nature of their gasoline.  But they could possibly assist in the re-imaging of the station....

                             21

******

Q:     And ... did he know or did you tell him in that conversation you had a
       contract with Moore Oil at that point?

A:     Yes.

Q:     Did he tell you anything about how that would be handled?

A:     Yeah.  He said that they could not make a deal with me until the contract
       with Moore Oil was handled....  We talked several times during that
       period.  And I asked about the possibility of selling me gas, to supply me
       with gas if, you know, my arrangement with Moore fell through....  He
       said he could possibly sell me gasoline.

******

Q:     And you had several conversations?

A:     Yes.

Q:     Did you call him; did he call you or both ways?  How did that work?

A:     I called him.

******

A:     [ ] At this time, I was still trying to actively market my station and hoping
       it was going to be sold.  And I was trying to get them to raise the offer.

******

A:     ... [W]hat it came down to was I was either going to sell [the station] to
       D&D and they were going to buy the station and bring it to Cowboys, or if
       that didn't work, I was going to brand it Cowboys and buy gas from them.
       I still thought the deal [to sell the station to D&D] was going to work
       because I had an offer [from D&D] on the table, and I thought, well, surely
       they'll raise.  They didn't give me [ ] the best shot up front.

Q:     You thought the [offer of $1.7 million] was just an opening deal that they
       would increase?

A:     Yes, sir.

22

> Q:     And they just wouldn't do it?
>
> A:     No, they wouldn't pay it....

(*Id*. at 35-51).

Despite this testimony by Pilato, Plaintiff urges the court to take a different view of D&D's conduct.  It argues – again, without any citations to the record – that

> [t]here was nothing unintentional about [D&D's] actions.  This is not a case in which D&D inadvertently or by mistake sold a load of fuel to the Galleria Chevron.  D&D first tried to buy the [s]tation, then to enter into a long term contract and re-image the station and finally to supply the station with unbranded gas.  Actions reveal intentions.  D&D chose to act despite their knowledge of the Moore Oil contract.

(Pl's Response (Doc. 48) 18).

The court has found nothing in the record to corroborate this argument.  Plaintiff attempts to compensate for this by asserting that, because D&D knew about the contract, the court should infer that it intended to interfere with the same.  However, Plaintiff offers no authority – and the court is aware of none – that stands for the proposition that a court should infer intent in similar circumstances when the record lacks any direct evidence thereof.  The fact that D&D knew about the contract does not, by itself, lead to the conclusion that it also knew its conduct was substantially certain to interfere with the contract.

The record actually suggests that D&D did not know that selling gasoline to Pilato at the end of October 2004 was *substantially certain* to interfere with Plaintiff's contract at the Galleria Chevron.  It is undisputed that D&D did not begin supplying the station until after Pilato had begun to buy gasoline from Veteran's Oil.[14]  (*Id*. at 26, 54; Moore 2008 Dep. 59).  This is

---

[14]The record is ambiguous as to why Pilato's arrangement with Veteran's Oil fell through.  Moore testified that Veteran's stopped supplying Pilato when it learned he was under contract with Plaintiff, but Pilato testified that he stopped

(continued...)

particularly relevant in light of the fact that D&D knew Pilato had been trying to terminate the contract and pay off his debt to Plaintiff by either selling the station or finding another supplier. By the fall of 2004, Pilato was actively pursuing several suppliers, not just D&D, for the purpose of getting out of his contract with Plaintiff:

Q: Did you talk to McCullough Oil?

A: Yeah.  I ... called some Chevron jobbers....

Q: What, if anything, did McCullough tell you?  Do you recall?

A: I remember calling – I don't remember the time frame.  I called Williams Oil Company in Fort Payne and talked to [a] guy ... and he met with me....

Q: What was that discussion about?

A: [I] asked them if they would help me with my gasoline contract.

Q: What did they tell you?

A: They asked me a lot of questions about my existing contract.  And it was not something that they said they could do.  It was – apparently among Chevron jobbers they didn't want to step on somebody else's toes in that market.

Q: Okay.  Who else?  Veteran's, D&D, McCullough.  Did you talk to McPherson?

A: Yeah.  I did talk to McPherson.

Q: Okay.

A: They had a program called E fuels or easy fuel.  That was a generic gasoline that I thought might go good.  McCullough has Texaco. [McPherson] couldn't brand it Texaco.  But that easy fuel is a non-branded gas.  And they could take credit cards.  Yeah.  I talked with them and met

---

<sup>14</sup>(...continued)
ordering gasoline from Veteran's for a reason that is not disclosed in the record.  (Moore 2008 Dep. 59; Pilato Dep. 35, respectively).  Either way, there is no evidence that D&D made any attempt to interfere with that arrangement, or that D&D was responsible for ending it.

with them.

Q:     All right.  When did you meet with them?

A:     Probably in the summer.  I talked to the guy's nephew or son-in-law, something like that.

Q:     And could you not strike an agreement with them?

A:     Once again, the numbers didn't work to where I could brand it and pay off my gas contract.

Q:     They talked to you about the Moore Oil contract too?

A:     Yeah.

(Pilato Dep. 55-57).  Plaintiff does not explain why D&D was so intent on disrupting its (Plaintiff's) relationship with Pilato, but made no similar efforts to prevent him from working with any of the other distributors he contacted.

In sum, the record does not support Plaintiff's view that D&D deliberately "stole" Pilato's business out from under it.  It does demonstrate that Pilato was looking for a way out of his contract with Plaintiff, even to the point that he was willing to relinquish his ownership of the Galleria Chevron, and if he could not sell the station, he was willing to work with any other supplier to pay off his obligations to Plaintiff.  (*Id*. at 37-41, 56-57).

At most, the record suggests that D&D was negligent in failing to ascertain whether the contract was still in effect when it began supplying the Galleria Chevron.  However, evidence of conduct that is merely negligent cannot, by itself, support a finding of *intentional* interference. *See Louisville*, 170 F. Supp. at 600 (citing to *Sparks v. McCreary*, 47 So. 332 (Ala. 1908); *Tennessee Coal & Iron Co. v. Kelly*, 50 So. 1008 (Ala. 1909); *United States Fidelity & Guaranty Co. v. Millonas*, 89 So. 732 (Ala. 1921); *Pickens v. Hal J. Copeland Groc. Co.*, 123 So. 223

(Ala. 1929); *Hill Grocery Co. v. Carroll*, 136 So. 789 (Ala. 1931); *Louisiana Oil Corp. v. Green*, 161 So. 479 (Ala. 1935); *Evans v. Swaim*, 18 So. 2d 400 (Ala. 1944); *McCluskey v. Steele*, 88 So. 367 (Ala. App. 1920) (concluding that "[i]n every Alabama case dealing with [intentional interference claims] there was some element other than mere negligence.  No case permits a recovery for the mere negligent interference with another's contract").

## V.    CONCLUSION

Having found that no genuine issue of material fact remains as to Plaintiff's intentional interference claims, and that Defendants are entitled to judgment as a matter of law as to these claims, the court need not further address Plaintiff's derivative claims of improper notice (Count III), suppression of material facts (Count IV), and fraudulent transfer of assets (Counts V & VI). The court concludes that Defendants' motion for summary judgment is due to be granted. Accordingly, Defendants' motion to exclude the testimony of Plaintiff's expert David Cusimano is deemed moot.[15]  (Doc. 46).  A separate order will be entered contemporaneously herewith.

**DONE** this the 9th day of June, 2010.

*John E. Ott*

**JOHN E. OTT**
United States Magistrate Judge

---

[15]The court does note that the plaintiff did not file any response to the motion to exclude despite having more than sufficient time to do so.  Additionally, premised on the information before the court, including the expert report and deposition of Cusimano, it appears that the motion is well founded.  The proponent of the testimony bears the burden of demonstrating the admissibility of the expert testimony.  *See Hall v. United Insurance Co. of America*, 367 F.3d 1255, 1261 (11th Cir. 2004) ("The burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence....") (citations omitted). This Plaintiff has failed to do.  Finally, the testimony would not alter the court's determination of this motion under the circumstances, particularly since Cusimano's testimony includes legal conclusions reserved for the trier of fact and it is premised, at least in part, on a lack of knowledge of industry practice in 2004 (see Cusimano Dep. at 131-32).